
FILED
2005 Jan-19  PM 02:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | |
|---|---|
| **JEFFREY S. MERSMANN**,       ) | |
|                     ) | |
|      Plaintiff,          ) | |
|                     ) | |
| v.                        ) | Civil Action No.: **CV-04-PT-1346-E** |

**JEFFREY S. MERSMANN,**              )

      Plaintiff,              )

v.              )          Civil Action No.: **CV-04-PT-1346-E**

**BELLSOUTH ADVERTISING &**              )
**PUBLISHING CORPORATION**              )
**(BAPCO)** or that Legal Entity, whether              )
Singular or plural, d/b/a BellSouth              )
Advertising & Publishing Corporation              )
(BAPCO), and Fictitious Defendant "A"              )
Being that legal entity, whether singular              )
Or plural, who or which terminated              )
Plaintiff's employment with said Defendant )
On or about, to-wit: August 8, 2003.  The              )
Names and addresses of said Fictitious              )
Defendants will be substituted by              )
Amendment when ascertained.              )
              )
      Defendants.              )
_____)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**EASTERN DIVISION**

**VALERIE WILLIAMS,**              )

      Plaintiff,              )

v.              )          Civil Action No.: **CV-04-PT-1348-E**

**BELLSOUTH ADVERTISING &**              )
**PUBLISHING CORPORATION**              )
**(BAPCO)** or that Legal Entity, whether              )
Singular or plural, d/b/a BellSouth              )
Advertising & Publishing Corporation              )
(BAPCO), and Fictitious Defendant "A"              )

1

Being that legal entity, whether singular      )
Or plural, who or which terminated             )
Plaintiff's employment with said Defendant     )
On or about, to-wit: August 8, 2003.  The      )
Names and addresses of said Fictitious         )
Defendants will be substituted by              )
Amendment when ascertained.                    )
                                               )
    Defendants.             )

## MEMORANDUM OPINION

These causes come on to be heard upon defendant BellSouth Advertising & Publishing Corporation's Motion for Summary Judgment, filed on November 17, 2004.

## FACTS[1] AND PROCEDURAL HISTORY

Plaintiff Jeffrey S. Mersmann ("Mersmann"), a white male, is a resident of Birmingham, Alabama and a United States citizen.  (Mersmann Cmpt. Ct. I ¶¶ 2-3, 17).  Plaintiff Valerie Williams ("Williams"), a black female, is a resident of Bessemer, Alabama and a United States citizen.  (Williams Cmpt. Ct. I ¶¶ 2-3, 17).  Defendant BellSouth Advertising & Publishing Corporation ("BAPCO") is a corporation doing business in Alabama.  (Mersmann Cmpt. Ct. I ¶ 4; Williams Cmpt. Ct. I ¶ 4).  Both Mersmann and Williams were employed by BAPCO for approximately seventeen (17) years prior to being laid off on August 8, 2003.  (Mersmann Cmpt. Ct. I ¶¶ 10, 24; Williams Cmpt. Ct. I ¶¶ 10, 24).  At the time of their layoff, both served as Directory Composers.   (Mersmann Cmpt. Ct. I ¶ 10; Williams Cmpt. Ct. I ¶ 10).

Prior to their layoffs, Mersmann and Williams reported to supervisor James Fountain, who in turn reported to manager Brad Knutson.  (Mersman Depo. p. 11; Williams Depo. p. 12).

---

[1] The court notes where "facts" appear disputed.

As Directory Composers, Mersmann and Williams were non-management or "craft" employees. Such employees were represented by a labor union, the Communications Workers of America ("Union").  (Ruth Decl. ¶ 2).  The National Labor Relations Board has certified the Union as the exclusive bargaining representative of BAPCO's craft employees.  (*Id.*)  Kenneth Ruth[2] ("Ruth")

---

[2]Plaintiffs move pursuant to Rule 12(f) to strike the Declaration of Kenneth Ruth. Plaintiffs also move to exclude any further testimony of Ruth.  In the alternative, plaintiffs request that this action be continued under Rule 56(f) so as to allow them time to take Ruth's deposition.

According to plaintiffs, defendant was required by the standing orders of this court and pursuant to Rule 26(a)(1) to disclose the name and address of all witnesses intended to be used in this action.  Plaintiffs assert that defendant did not list Kenneth Ruth's name or address in its Initial Disclosure.  It is plaintiffs' position that defendant knew or should have known of its intention to call Ruth as a witness at the time of this disclosure.  Plaintiffs further state that their counsel requested that defendant produce Ruth and Morgan to give depositions, but was told that Ruth was no longer associated with defendant and his whereabouts were unknown.

Plaintiffs assert that the discovery cutoff in this case was November 3, 2004.  On October 4, 2004, plaintiffs state, defendant made known its intention to use Ruth as a witness in its pre-trial disclosure.  However, defendant failed to provide Ruth's address.  According to plaintiffs, their counsel was told by defendant's counsel that Ruth's whereabouts were still unknown at that time.

On November 17, 2004, defendant filed this Motion for Summary Judgement which was supported by Ruth's Declaration, dated November 16, 2004.  Plaintiffs point to Ruth's testimony that he served as the bargaining chair for the BAPCO bargaining unit until March 2004.  Given this testimony, plaintiffs argue that defendant must have known of Ruth's whereabouts as of March 1, 2004.  Further, plaintiffs note that defendant requested that the deadline for dispositive motions be moved to November 17, 2004, after the discovery cutoff of November 3, 2004. Given this situation, plaintiffs argue that defendant deliberately withheld Ruth's contact information so as to prevent them from taking his deposition prior to the discovery cutoff. Additionally, plaintiffs assert that defendant continues to withhold Ruth's contact information. Plaintiffs maintain that their counsel unsuccessfully tried locate Ruth using every method available without exceeding ethical rules concerning the contacting of employees of an opposing party.

Plaintiffs assert that they have been unable to depose Ruth and have no means of determining his whereabouts other than through defendant.  Given that defendant's Motion relies heavily upon Ruth's Declaration, plaintiffs maintain that defendant's withholding of Ruth's

contact information has harmed their ability to oppose this Motion.

Plaintiffs also move to strike paragraphs 4 through 9 of Ruth's Declaration as hearsay. Plaintiffs assert that there is no proper predicate to establish how Ruth has personal knowledge of the things asserted therein.

Defendant opposes plaintiffs' Motion to Strike Ruth's Declaration.  Defendant notes that plaintiffs repeatedly contacted Ruth in person, and by telephone and email to complain regarding the circumstances of their layoff.  Defendant also asserts that the Union's offices are located within ten miles of the BAPCO center where plaintiffs worked.  Therefore, defendant argues, plaintiffs had means of contacting Ruth.  Additionally, defendant asserts that plaintiffs could have simply looked up Ruth's home address at www.whitepages.com.  According to defendant, there is only one Kenneth S. Ruth listed.

Defendant argues that, throughout the course of discovery, it repeatedly identified Ruth as an individual with relevant knowledge.  Defendant notes that it discussed Ruth with each of the plaintiffs during their depositions.  Further, defendant maintains that it provided plaintiffs with a copy of the Memorandum of Agreement at issue in this case.  This Memorandum bears Ruth's complete signature.  Additionally, defendant asserts that plaintiffs introduced this document during Morgan's deposition and extensively questioned him regarding Ruth.

Defendant points out that, in response to plaintiffs' first interrogatories, it volunteered information about Ruth's role in negotiating the Collective Bargaining Agreement and the addendum to it.  According to defendant, plaintiffs never requested Ruth's address through an interrogatory or otherwise.

Defendant argues that, a month before the close of discovery, both parties filed required pretrial disclosures, and both parties identified Ruth as a witness who might be called at trial. Plaintiffs listed 18 witnesses by name, including Ruth, but provided an address for only one witness.  Defendant listed 11 potential witnesses and provided addresses for all except the two Union officials, Local President Sonja Abbot and Ruth.  For the two Union officials, defendant listed the Union as their contact.  According to defendant, plaintiffs never advised that this contact information was inadequate, never claimed to be unable to locate the Union offices, and never claimed to be unable to reach Abbot or Ruth via the Union.

Defendant asserts that, in preparing for its Motion for Summary Judgement, it telephoned the Union and asked whether Ruth would provide a declaration.  Ruth had retired from the Union in the spring of 2004, but the Union agreed to forward to him a draft declaration provided by defendant.  According to defendant, Ruth revised and completed the declaration, returning it to defendant.  Defendant asserts that it did not speak with Ruth during this process.

Defendant points to a letter, dated September 10, 2004, in which its counsel informed

4

was the Union's collective bargaining chairman for the BAPCO craft employees from April 1991

through March 2004.  (*Id.* at ¶ 3).  In that capacity, Ruth was the Unions's top official responsible

for representing BAPCO's craft employees in all labor related matters, including grievance

handling, contract administration, and collective bargaining.  (*Id.*)  On the corporation's side,

Dennis Morgan[3] ("Morgan") is BAPCO's Director of Employee Relations, with oversight of

_____

plaintiffs' counsel that Ruth was not a BAPCO employee, and that plaintiffs would have to
subpoena him directly to appear for a deposition.  In a letter dated October 5, 2004, plaintiffs'
counsel advised defendant that she might try to locate Ruth for deposition.  However, plaintiffs'
counsel did not request defendant's assistance in locating him.  According to defendant, it had no
reason to believe that he was not readily available.

Defendant argues that plaintiffs' assertion that it has somehow concealed Ruth's location
from them is absurd.  Defendant contest plaintiffs' counsel's assertion that defendant's counsel
told her Ruth's whereabouts were unknown.  Defendant asserts that plaintiffs' counsel never
requested an address for Ruth.  Defendant also notes that Ruth was a CWA employee and official
and not a BAPCO manager.  Therefore, no "ethics rules" prevented plaintiffs' counsel from
contacting Ruth, who was readily available.

Defendant also contests plaintiffs' argument that it requested an extension of the
summary judgment deadline for purposes of preventing plaintiffs from contacting and deposing
Ruth.  Defendant asserts that it requested this short extension because plaintiffs had filed motions
to compel (later withdrawn) which were set for hearing the day before the summary judgment
motion deadline and because the transcripts for witnesses deposed by plaintiffs late in October
were not yet available.  According to defendant, the short extension in no way impeded
plaintiffs' ability to depose Ruth.

Finally, defendant asserts that plaintiffs' counsel removed from its Atlanta office the text
pager belonging to BellSouth paralegal Jennifer Constantinides.  According to defendant, these
pagers are used by BellSouth counsel and paralegals to store contact information and to send text
messages to each other and to BellSouth managers and witnesses.  The front of the text pager
identified the owner as Constantinides and gave her address and telephone number.  Defendant
asserts that plaintiffs' counsel removed the pager from its holster, opened it, and searched its
contents.  Defendant asserts that, through this misappropriation of the pager, plaintiffs' counsel
had access to the same information as defendant's counsel.

[3] Plaintiffs move to strike the Declaration of Dennis Morgan.  According to plaintiffs, the
contents of this declaration are nothing more than self-serving statements favoring defendant's
position.  Plaintiffs further maintain that the majority of the Declaration is based upon

labor relations and collective bargaining.[4]  (Morgan Decl. ¶ 2).

_____

objectionable hearsay regarding purported conversations with Ruth.  Plaintiffs assert that paragraphs 3 through 13 of the Declaration are hearsay.

Defendant opposes plaintiff's motion to strike Morgan's Declaration.

[4] Plaintiffs object to paragraph 2 of Morgan's Declaration, arguing that there is no evidence to support that Morgan was in any way directly involved in the creation of the collective bargaining agreement ("CBA") negotiated by BAPCO and the Union.

Defendant contest this assertion by plaintiffs.  Defendant contends that Morgan's Declaration establishes that he is responsible for labor relations and collective bargaining with the Union.  Defendant also points to the following deposition testimony of Morgan:

> Q:    Anytime a new collective bargaining agreement is hammered out, do you have input between yourself and the people who are contending for this new bargaining agreement?
>
> A:    I have been at the bargaining table for the last five contracts.  So that would be yes.
>
> Q:    And the union comes in and actually makes their request or demands, do they not, and then the company has someone who reciprocates; and between the two groups of people, they hammer out something that both sides can live with hopefully?
>
> A:    That's pretty accurate, yep.
>
> Q:    And that's what you do up to the present time?
>
> A:    Correct.
>
> Q:    Since you were there for the last five contracts, would you have been there when the present contract for the BAPCO people in Birmingham was worked out?
>
> A:    Yes.
>
> Q:    And would you have been there when the bargaining agreement immediately before this present one was worked out?
>
> A:    Yes.
>
> Q:    Do you recall the date when the present bargaining agreement with BAPCO in Birmingham, the approximate date, month, and year maybe, when that was worked out?
>
> A:    Well, the present one is actually one that just started on August 8 of this year.
>
> Q:    And the immediate past one was when?
>
> A:    That would have been early August of 2001.

(Morgan Depo., pp. 17-19) (emphasis added).

6

The collective bargaining agreement ("CBA") negotiated by BAPCO and the Union governs virtually all aspects of craft employment, including pay, vacation, surplus, hours of work, and the like. (Morgan Decl. ¶ 3). Article 7 of the CBA governs force adjustments (i.e., surpluses or layoffs) of craft employees. (*Id.* at ¶ 4). The Article describes how BAPCO must announce and carry out a surplus, and it governs the contractual options available to surplus employees. (*Id.*)

Morgan testified that, in late 2001, BAPCO and the Union "were in a high level of disagreement on a lot of issues." (Morgan Depo. p. 47). According to Morgan, the Company and the Union were involved in contentious disputes regarding various initiatives the company had recently implemented, including an employee performance management plan, a strategic compensation plan, several joint ventures with other BellSouth companies, and a reassignment pay protection plan. (*Id.*) On October 18, 2001, BAPCO declared a company-wide surplus of more than 100 positions, including the positions of three photographic assistants in Birmingham.

---

Q:      (By Ms. Betty Love) Were you one of the people who hammered out the
        memorandum of agreement between BAPCO and the union concerning
        George?
A:      Yes, I was.
Q:      Anybody else who was present at that?
A:      My union counterpart.
Q:      Who was that?
A:      Ken Ruth.

(*Id.* at 50-51).

Defendant further asserts that plaintiffs' counsel deposed Morgan as the 30(b)(6) corporate representative and spent several hours questioning him regarding the CBA, negotiations with the Union, various articles of the CBA, and the Memorandum of Agreement. Defendant concludes that Morgan can authenticate the collective bargaining agreement he negotiated with the Union. Likewise, defendant maintains, he is competent to describe the labor relations with his Union counterpart, Ruth.

7

(Morgan Decl. ¶¶ 5-6).  The October 2001 surplus was the largest or second largest surplus

BAPCO has ever declared.  (*Id.* at ¶ 5).[5]  Morgan testified that the Union became extremely upset

upon learning of the impending layoff of such a large number of craft employees, and labor

relations between BAPCO and the Union reached a nadir.  (*Id.* at ¶ 6).[6]

Ruth testified that one of the Union's chief objectives was to protect the surplus workers'

employment and reduce the number of workers who would be involuntarily laid off as a result of

the surplus.  (Ruth Decl. ¶ 4).  In an effort to improve the labor relationship, Morgan testified,

BAPCO promised the Union that it would do what it could to minimize the number of employees

who involuntarily lost their jobs as part of the surplus.  (Morgan Decl. ¶ 6).

Morgan testified that under BAPCO's Expanded Supplemental Income Protection Plan

("ESIPP"), BAPCO may, in certain circumstances, offer ESIPP payments to employees in order

to induce them to leave the payroll voluntarily.  (Morgan Decl. ¶ 7).[7]  Ruth testified that, a few

months after BAPCO declared the October 2001 surplus, he learned that a craft employee,

Evelyn Sanders ("Sanders"), wished to take an ESIPP payment and voluntarily leave her job.

Sanders was not one of the surplus employees, and she was in no danger of losing her job

---

[5] Plaintiffs argue that paragraph 5 of Morgan's Declaration is hearsay because no predicate is presented to show that Morgan had any personal involvement with the October 18, 2001 surplus.

[6] Plaintiffs argue that paragraph 6 of Morgan's Declaration is hearsay and based upon speculation.  According to plaintiffs, Morgan cannot have personal knowledge of the feelings of the entire Union.

[7] Plaintiffs move to strike paragraph 7 of Morgan's Declaration, arguing that there has been no predicate laid indicating that Morgan was personally involved with the creation and/or interpretation of the ESIPP.  Plaintiffs assert that there has been no foundation presented which would qualify Morgan to testify regarding the meaning or purpose of the plan.

involuntarily.  (Ruth Decl. ¶ 5).  Around the same time, Ruth stated, he learned that one of the surplus Birmingham employees had "bumped" George Varghese ("Varghese"), a Directory Composer.  (*Id.* at ¶ 6).  As a bumped employee, Varghese likely would be involuntarily laid off from BAPCO.  He did not want to leave the company.  (*Id.*)

Morgan testified that Ruth approached him at this time and told him that at least one employee in Birmingham would leave BAPCO voluntarily if the company offered ESIPP.  (Morgan Decl. ¶ 8).  Ruth, according to Morgan, proposed that the company and Union negotiate an addendum to the CBA, applicable only to the October 18, 2001 surplus in the Birmingham location, that would allow non-surplus Birmingham employees to take ESIPP and allow bumped employees to backfill any vacancies created.  (*Id.*)  According to Morgan, Ruth pointed out that the Company had promised to try to minimize job loss and emphasized that this would be a one-time request applicable only to the October 18, 2001 surplus.  (*Id.*)

Morgan testified that he accepted the proposal and, on April 2, 2002, he and Ruth executed an addendum to the CBA, titled "Memorandum of Agreement."  (Morgan Decl. ¶ 9).  The addendum was expressly "limited to the Birmingham location of the Company-wide surplus declared on October 18, 2001" and was designated a one-time, non-precedent-setting agreement.  (Morgan Decl. ¶ 9; Exh. B to Morgan Decl.).

BAPCO asserts that, pursuant to the addendum, Sanders took ESIPP and voluntarily left her job, thus creating a vacancy for Varghese.  According to BAPCO, Sanders is a white American and Varghese is an American born in India who is either Caucasian or Asian.

Morgan testified that he did not know the race or national origin of the employee(s) who would be eligible for ESIPP payments or for any ESIPP-created job vacancies as a result of the

addendum.  (Morgan Decl. ¶ 10).  Ruth testified that he did not think that Morgan or he mentioned by name the employees who would be impacted by the addendum.  (Ruth Decl. ¶ 8).  Ruth further stated that race and national origin played no role in the decision to negotiate and execute the addendum.  (*Id.*)

According to Morgan, between the October 2001 surplus and 2003, BAPCO declared at least two more surpluses.  (Morgan Decl. ¶ 11).  However, Morgan asserted, by its terms, the addendum did not apply to later surpluses.  (*Id.*)  In early 2003, BAPCO declared a small surpluses of three Collection Representative positions.  (*Id.* at ¶12; Morgan Depo. p. 32).  Ruth testified that Mersmann and Williams, who were bumped by two of the surplus Collection Representatives, wanted the Union and BAPCO to expand the addendum so that it would apply to the 2003 surplus.  (Ruth Decl. ¶ 9).  However, Ruth asserted, that agreement was intended as a one-time arrangement only, and was not intended to permanently supercede Article 7 or to become a practice applicable to all surpluses.  (*Id.*).  Nonetheless, Ruth stated that he presented Mersmann and Williams' request to Morgan, but he declined to revise the addendum.  (*Id.*)  Morgan testified that, at the time he refused this request, he did not know the races or national origins of any employees who might have benefitted.  (Morgan Decl. ¶ 13).

Morgan testified that the circumstances had changed substantially since the October 2001 surplus:

> [T]he relationship had changed significantly.  It had gotten much better in that period, the relationship between the union and the company.  So my working relationship with Ken [Ruth] had improved significantly from the [October 2001] surplus to the [2003] one.
>
> I also know that during that time, we were going through – the company was going through some systems changes in how we published the books.  It's a term

> called access, a system that we called access.  In the [October 2001] surplus, it was new and just being implemented.  Lots of implementation issues and peaks and valleys and how it was going to do and enhancements needed.
>
> By the time we got to the [2003] one, the system had stabilized significantly.  So they knew how the system was going to perform.  And I think my understanding was that they also knew that as a result of that, they were over head count.  They actually had more people than they really needed.

(Morgan Depo. pp. 68-69).  Morgan also stated that, in determining the size of the 2003 surplus, BAPCO "knew of two people that were going to retire, were planning to retire, and attrition would take care of those jobs."  (*Id.* at 74).  According to Morgan, the Company intended to use that "attrition as a tool to reduce the workforce" voluntarily in conjunction with the involuntary surplus.  (*Id.* at 83).  If BAPCO had used ESIPP to create job vacancies, Morgan asserted, it "would have negated the use of the attrition that was naturally taking place."  (*Id.*)

Plaintiffs give a slightly different version of the facts.  Plaintiffs assert that in August of 2001, BAPCO and the Union entered into a new collective bargaining agreement that superceded the provisions of the prior agreement.  Regarding the prior agreement, Mersmann testified that the force adjustment provision provided a step-by-step process that was meant to reduce the detrimental impact of a surplus in the early stages by offering ESIPP payments to employees office-wide.  (Mersmann Decl. ¶ 20).  According to Mersmann, when surpluses arose prior to those at issue here, BAPCO regularly offered ESIPP to employees throughout the entire office.  (*Id.*)  An employee taking ESIPP would then create a vacancy for a surplus person who would otherwise loose his or her job.  (*Id.*)  When ESIPP was not offered during a surplus, Mersmann stated, BAPCO always laid off the last hired, most junior employees in the BAPCO Birmingham publishing group.  (*Id.* at ¶ 6).

11

Plaintiffs assert that this procedure was altered with the new 2001 agreement.  Mersmann testified that, under the new agreement, ESIPP was offered to create vacancies only for those employees the company defined as "surplus."  (Mersmann Decl. ¶ 21).  When ESIPP did not create enough vacancies for all surplus employees, plaintiffs maintain, a surplus employee could take an early departure package and leave BAPCO, or they could "bump" another, less-senior, employee with an equal or lower pay scale.  The surplus employee would then take the job and pay rate of the bumped employee.  The bumped employee lost his or her job.  The bumped employee did not have the option of taking an early departure package or of bumping another employee.  (Morgan Depo., p. 58).  Additionally, BAPCO would not offer ESIPP to induce non-surplus employees to leave and, thereby, create an opening for the bumped employee. (Mersmann Decl. ¶ 21).

Mersmann testified that approximately three years prior to the surpluses at issue here, the BAPCO publishing group permanently hired approximately 15 employees as Directory Clerks who had initially been brought in on a temporary basis.  (Mersmann Decl. ¶ 8).  Mersmann stated that he believed these employees were unnecessary and that they inflated the publishing workforce with younger, lower paid employees.  (*Id.*)  These new employees raised the number of Directory Clerks so high that, according to Mersmann, the company could no longer allow a displaced Composer, regardless of seniority, to move down a wage scale and fill a Directory Clerk position vacated through normal attrition.  (*Id.*)

Mersmann testified that the new bumping procedure was first utilized during the surplus in which Varghese was bumped.  (Mersmann Decl. ¶ 18).  In addition to Varghese, Holly Thompson, a white female and a Directory Composer with approximately 15 years of experience,

was also bumped during this surplus.  (*Id.*)  Mersmann stated that Varghese and Thompson were

bumped despite their seniority over the recently hired Directory Clerks.  (*Id.* at ¶ 19).  According

to Mersmann, in both the surplus in which Varghese and Thompson were bumped and the

surplus in which he and Williams were bumped, there were Directory Clerks who were willing to

take an ESIPP package and depart to create vacancies for the bumped employees.  (*Id.* at ¶ 22).

However, the company did not offer ESIPP packages to create openings for the bumped

employees.  (*Id.* at ¶ 23).  Mersmann asserted that, in the October 2001 surplus involving

Varghese, Fred Green, a surplus Photo Assistant, opted to voluntarily leave the company instead

of bumping Thompson.  (*Id.* at ¶ 24).  This left Varghese as the only bumped employee in the

Birmingham Publishing Group.  (*Id.*)  Mersmann testified that at this time:

> George Varghese was visibly upset and spoke to [Mersmann] often about his
> frustration and what his options might be.  He told [Mersmann] he had consulted
> an employment attorney, and had made numerous phone calls to company and
> union officials arguing that he was being treated unfairly.  He had also met in
> person with management and union officials.  George Varghese had a heavy Asian
> accent, is dark-skinned, and was the only employee of his national origin working
> at BAPCO Birmingham.

(*Id.* at ¶¶ 25-26).

Mersmann further stated that, on Varghese's final day of employment, the company

announced the "one-time only, non-precedent setting Memorandum of Agreement" which

amended the agreement between BAPCO and the Union and allowed another employee to take

an ESIPP package and depart to create a position for Varghese.  (Mersmann Decl. ¶ 27).

Both Mersmann and Williams filed charges of discrimination with the Equal

Employment Opportunity Commission on July 28, 2003 and received Right to Sue Letters on

April 9, 2004.  (Mersmann Cmpt. Ct. I ¶ 7; Williams Cmpt. Ct. I ¶ 7).  They brought the present

actions against BAPCO on June 28, 2004.  Mersmann and Williams' Complaints are nearly

identical and each contained two counts alleging racial and national origin discrimination in

violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.[8]  This court

consolidated the two actions on October 21, 2004.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings,

discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue

as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A dispute is

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for

---

[8] Both complaints claim that Varghese is of Central Asian origin and a natural born citizen of a country foreign to the United States.  (Mersmann Cmpt. Ct. I ¶¶ 14, 16; Williams Cmpt. Ct. I ¶¶ 14, 16).  On the other hand, the complaints assert that Mersmann, a white male, and Williams, a black female, are natural born citizens of the United States.  (Mersmann Cmpt. Ct. I ¶ 21; Williams Cmpt. Ct. I ¶ 21).  Count I of the complaints discusses the employment accommodations made for Varghese which were not extended to plaintiffs, and alleges:

> The actions of Defendants amounted to disparate treatment favoring an individual of a foreign country, more specifically Central Asia, over an individual from the United States of America.  Plaintiff[s] [were] subjected to disparate treatment based upon [their] race, color and national origin.

(Mersmann Cmpt. Ct. I ¶ 25; Williams Cmpt. Ct. I ¶ 25).  Count II of the complaints alleges:

> Plaintiff[s] allege[] that [they were] terminated in whole or in part due to [their] race in violation of the Civil Rights Act of 1964 as amended 42 U.S.C. Section 2000(e) et. seq. and 42 U.S.C. sec. 1981 as amended. . . .

> Plaintiff[s] allege[] that [they were] discharged because of [their] race, in violation of 42 U.S.C. sec. 2000(e), et. seq.

(Mersmann Cmpt. Ct. II ¶¶ 2, 4; Williams Cmpt. Ct. II ¶¶ 2, 4).

14

summary judgment bears the initial burden of explaining the basis of his motion.  *Celotex*, 477 U.S. at 323.  "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial."  *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted).  The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial.  *Celotex*, 477 U.S. at 324.  The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'"  *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted).  Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial.  *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery.  *Comer*, 265 F.3d at 1192.  Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party."  *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999).  Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion.  *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

**ARGUMENTS**[9]

## I.   <u>Defendant's Motion.</u>

---

[9] This section summarizes the arguments made by the parties and does not necessarily reflect the conclusions reached by the court.

15

### A.       Plaintiffs' Claims of Discrimination Are Unsubstantiated.

Defendant notes, "[t]he test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment cases." *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 472 (11th Cir. 1999).  According to defendant, a plaintiff alleging unlawful employment discrimination in violation of Section 1981 and Title VII "may choose one of three ways to establish a prima facie case: (1) direct evidence of discriminatory intent; (2) statistical proof of disparate treatment; or (3) meeting a test such as that set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973)." *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.,* 97 F.3d 436, 439 (11th Cir. 1996), *cert. denied*, 521 U.S. 1119 (1997).  If a plaintiff "fail[s] to establish a prima facie case, thereby failing to establish a genuine issue of material fact," defendant argues, entry of summary judgment in favor of the defendant is appropriate. *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 608 (11th Cir. 1987).

In this case, defendant contends, plaintiffs have offered no direct evidence[10] or statistical proof of disparate treatment.  According to defendant, in the absence of direct or statistical evidence, an employee must prove a prima facie case by establishing each element of the *McDonnell Douglas* analysis.  Defendant asserts that a prima facie case of race discrimination in a lay off resulting from a reduction in force ("RIF") requires proof of the following elements: "(1) [Plaintiffs were] member[s] of [a protected group] and [were] adversely affected by an

---

[10] Defendant notes that direct evidence is evidence which, if believed, "establishes discriminatory intent without inference or presumption." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1993).  *See also Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989).  "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate . . . constitute direct evidence of discrimination."  *Carter,* 870 F.2d at 582.

employment decision; (2) [Plaintiffs were] qualified for [their] current position[s] or to assume []other position[s] at the time of discharge; and (3) [T]here is evidence from which a reasonable factfinder could conclude that the employer intended to discriminate on the basis of [the protected characteristic] in making its employment decision." *Mitchell v. USBI Co.,* 186 F.3d 1352, 1354 (11th Cir. 1999).  Defendant argues that the burden is on the plaintiffs to produce probative evidence showing each of these elements, and if the plaintiffs fail to carry this burden, summary judgment is appropriate. *See Plaisance v. Travelers Ins. Co.*, 880 F.Supp. 798, 808-09 (N.D. Ga. 1994) (discussing situation where plaintiff failed to meet burden and summary judgment was recommended), *aff'd* 56 F.3d 1391 (11th Cir. 1995).

In most but not all cases, defendant asserts, establishing a prima facie case raises an inference of discrimination, which the defendant must rebut.  To do so, "the defendant need only to produce evidence that there is a legitimate, non-discriminatory reason for the challenged employment action.  The presumption of discrimination is then rebutted and the employer is entitled to summary judgement unless the plaintiff proffers evidence sufficient to create a genuine issue of material fact that discrimination was actually the reason for the challenged action." *Kelliher v. Veneman,* 313 F.3d 1270, 1275 (11th Cir. 2002).

### 1.  Plaintiffs Cannot Establish a Prima Facie Case.

#### a.  There Is No Evidence Showing BAPCO Intended to Discriminate on the Basis of Race or National Origin.

Defendant acknowledges that, like all employees, plaintiffs belong to protected racial groups: Mersmann is white, and Williams is black.  Both are of American national origin, and defendant agrees that both were qualified for their jobs.  However, defendant argues, plaintiffs

17

cannot establish the third element of a prima facie case, which requires evidence from which a factfinder could conclude that BAPCO discriminated against them because they are black and white Americans.

Defendant maintains that plaintiffs were bumped by surplus Collection Representatives. In accordance with Article 7 of the CBA, defendant asserts, they were separated from employment and now have recall rights if and when appropriate job vacancies become available. Defendant points to plaintiffs' deposition testimonies and notes that they both conceded that they never heard any of their BellSouth supervisors or managers make any remark reflecting racial bias or bias against those of American national origin. (Mersmann Depo. p. 36; Williams Depo. p. 36). *See E.E.O.C. v. Clay Printing Co.,* 955 F.2d 936, 941 (4th Cir. 1992) (stating, "[u]nquestionably, when a plaintiff admits under oath that he or she cannot point to any statement or piece of physical evidence indicative of . . . discrimination, it undermines the plaintiff's claim that but for [discrimination] the employment decision would not have been made").

Defendant argues that courts have repeatedly recognized:

> [A] RIF is sometimes an undesirable business necessity. Terminating employees who are serving in a satisfactory manner, and who may have been with a particular company for an extended period of time can be extremely difficult, and can lead to hard feelings and a sense of resentment. However, such actions are sometimes required in the business world. The courtroom cannot take the place of the boardroom in determining how, where, when, and why a RIF should occur. "The essence of a RIF is that competent employees who in more prosperous times would continue and flourish at a company may nevertheless have to be fired."

*Bibby v. Drummond Co., Inc.*, 818 F.Supp. 325, 330 (N.D. Ala. 1993) (quoting, *Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1083 (11th Cir. 1990)). *See, e.g., Mitchell,* 186 F.3d at

18

1354-55 (affirming summary judgment in RIF-related discrimination case and quoting *Elrod v.*

*Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir.1991), for the proposition that "[f]ederal

courts do not sit as a super-personnel department that reexamines an entity's business

decisions"); *Thomas v. Wal-Mart Stores, Inc.,* 1999 WL 642235 at *4 (S.D. Ala. 1999) (granting

summary judgment in RIF-related discrimination case and stating that courts will not second-

guess an employer's business decisions).

> **b.      Plaintiffs Cannot Establish a Prima Facie Case Because the Decision-Maker Did Not Know Their Race or National Origin.**

Defendant maintains that, assuming *arguendo* that plaintiffs can somehow establish the

third element, they still cannot establish a prima facie case.  According to defendant, Morgan,

who negotiated the addendum for the 2001 surplus and declined to extend it to cover the 2003

surplus, did not know plaintiffs' races or national origin.

Defendant argues that if a decisionmaker does not know an employee's protected class,

no inference of discrimination can arise, and the employee cannot establish a prima facie case.

Defendant contends, "[a]n employer cannot intentionally discriminate against [an individual]

based on race unless the employer knows the [individual's] race."  *Robinson v. Adams,* 847 F.2d

1315, 1316 (9th Cir. 1987).  *See also* Casarez *v. Burlington Northern/Santa Fe Co.,* 193 F.3d

334, 339 (5th Cir. 1999) (affirming judgment as a matter of law on retaliation claim when

plaintiff "ha[d] not even shown that [the decisionmakers] were aware that [plaintiff had] engaged

in protected activity"); *Zuniga v. Koch Midstream Servs. Co.,* 2000 U.S. Dist. LEXIS 5439 at

*17 (W.D. Tex. 2000) (granting summary judgment on ADEA claim because the plaintiff

"offered no evidence that any of the interviewers or decisionmakers had actual knowledge of his

age at the time of the interview"); *Gibson v. Frank,* 785 F.Supp. 677, 682 (S.D. Ohio 1990)

(stating, "[b]ecause the Board members did not know plaintiff's race, they could not have

discriminated against him on that basis"), *aff'd*, 946 F.2d 1229 (6th Cir. 1991).

      Defendant argues that the Eleventh Circuit recently adopted a rule whereby a plaintiff

cannot establish his or her prima facie case where the decisionmaker does not know of plaintiff's

protected classification.  Defendant points to *Lubetsky v. Applied Card Systems, Inc.,* 296 F.3d

1301 (11th Cir. 2002), in which the plaintiff alleged that the prospective employer rescinded its

offer of employment because he was Jewish.  296 F.3d at 1303.  The district court granted

summary judgment, "finding [plaintiff] could not establish his prima facie case because there

was no evidence [the decisionmaker] knew [plaintiff] was Jewish." *Id.* at 1304.  The Eleventh

Circuit affirmed, ruling that a court "must focus on the actual knowledge and actions of the

decision-maker. . . . [Plaintiff] failed to establish a prima facie case . . . because he did not

present any evidence that the decision-maker knew of his religion." *Id.* at 1306.  Defendant notes

that the Eleventh Circuit cited to several appellate opinions reaching similar conclusions. *Id.* at

1305-06.  *See also Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005-07 (7th Cir.2001) (holding,

even though plaintiff was visibly pregnant, she failed to establish a prima facie case of pregnancy

discrimination when she could not prove the decisionmaker knew she was pregnant); *Geraci v.

Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 580- 82 (3rd Cir.1996) (holding plaintiff failed to

establish a prima facie case of pregnancy discrimination where she could not provide any

evidence that the decisionmaker knew she was pregnant); *Robinson v. Adams*, 847 F.2d 1315,

1316 (9th Cir.1987) (concluding the *McDonnell Douglas* elements did not rationally create an

inference of intentional discrimination where plaintiff offered no evidence the decision-makers

saw information concerning his race).

Defendant argues that, in this case, Morgan, the decisionmaker, did not know plaintiffs' races or national origins prior to making his decision not to extend the 2001 agreement to the 2003 surplus.  According to defendant, Morgan lives and works in Tucker, Georgia while the plaintiffs lived and worked in or near Hoover, Alabama.  Additionally, defendant asserts, prior to his deposition, Morgan had never met the plaintiffs.  Given this, defendant contends that plaintiffs have failed to establish a prima facie case.

**B.      Plaintiffs Have Offered No Evidence of Pretext.**

Defendant further contends that, because plaintiffs have not established a prima facie case, BAPCO has no burden of production.  Nonetheless, defendant asserts, it has articulated a legitimate, non-discriminatory reason for plaintiffs' separation from employment: they were laid off in accordance with the terms of the CBA.  According to defendant, plaintiffs lack evidence suggesting that this stated reason was a mere pretext for discriminating against black and white Americans.

Defendant states that plaintiffs point to the addendum negotiated in connection with the 2001 surplus and argue that it should also have applied to the surplus affecting them.  According to defendant, this argument ignores several key facts: (1) the addendum is a limited, fixed-term agreement applicable only to the October 2001 surplus; (2) in the two surpluses following the October 2001 surplus and preceding the 2003 surplus, Article 7 governed without modification and the addendum had no effect; (3) the Union and BAPCO negotiated the addendum to ameliorate the effects of the huge October 2001 surplus, whereas the 2003 surplus affected only a few employees; and (4) as detailed by Morgan, the business conditions which induced the

21

company to execute the addendum had significantly changed by the time of the 2003 surplus. Defendant concludes that its refusal to expand the addendum to cover subsequent surpluses in general, and the 2003 surplus in particular, is not alone evidence of an intent to discriminate against black and white Americans.

II.    **Plaintiffs' Response.**

A.    **Claim One - Disparate Treatment.**

Plaintiffs assert that defendant discriminated against them in violation of Title VII by favoring Varghese. According to plaintiffs, defendant violated the contract between it and the Union by entering into the "one-time-non-precedent setting agreement" which allowed Varghese to retain his job. Plaintiffs maintain that defendant favored Varghese because he "appeared" to be from the Middle East, and defendant wished to avoid charges of "backlash discrimination" after the occurrences of September 11, 2001. Plaintiffs point to a November 19, 2001 Joint Statement of the EEOC and the Justice Department, which encourages victims of such discrimination to come forward with complaints.

Plaintiffs dispute defendant's arguments that the decision makers here did not know Varghese's race or national origin and were not motivated to make the one-time-non-precedent-setting agreement by such characteristics. Plaintiffs argue that it is suspect that the company made this one-time alteration to the new 2001 agreement with the union so soon after its implementation. Plaintiffs also draw attention to the evidence that this special agreement was reached only on Varghese's last day of employment and that Varghese was the only person of his national origin working in defendant's Birmingham division. According to plaintiffs, defendant cannot explain why Varghese was the only employee out of the over 100 targeted by the October

2001 surplus who received such special consideration.  Neither, plaintiffs argue, can defendant explain why the same accommodation was not extended to them in the 2003 surplus.

Plaintiffs appear to argue that the new 2001 agreement between the Union and BAPCO allowed the company to save money by using surpluses as a means of eliminating higher-paid, more senior employees, while retaining lower-paid employees.  Plaintiffs assert that, under the new Force Adjustment Policy, bumped employees with seniority were eliminated while less senior employees were allowed to keep their jobs.  According to plaintiffs, the approximately 15 Directory Clerks who were hired around three years prior to the surpluses at issue were paid at a wage scale of 10.  Plaintiffs assert that Directory Composers, such as themselves, were paid at a wage scale of 16.  These 15 new employees, plaintiffs argue, were most likely the cause of the surplus.  However, they assert, these employees, with their lower pay, were allowed to keep their jobs, while they, as bumped employees, were laid off despite their seniority.[11]  According to plaintiffs, under the force adjustment procedure in place, a surplus employee would be unlikely to bump one of these Directory Clerks because of their low pay rate.  Instead, a surplus employee would most likely bump someone with only slightly less seniority.  This procedure, plaintiffs maintain, ensured that higher-paid employees were laid off while those at a lower pay rate were retained.  Plaintiff Mersmann stated:

> [I]t became obvious to me that it was the company's intent to narrowly define the bumping procedure to divest itself of as many older, senior employees as possible. By first inflating the headcount with newly hired Directory Clerks and then limiting the bumping rights and not allowing the placement of affected Directory Composers in Directory Clerk positions, the company achieved the result of reducing senior level employees for a financial benefit to BAPCO without anyone

---

[11] In their Response, plaintiffs state that this outcome "was in essence a tricky form of age discrimination."

realizing that what they were effectively doing was age discrimination.

(Mersmann Decl. ¶ 17).

Plaintiffs further contend that the reasons given by defendant for accommodating Varghese, but not them, by offering ESIPP are pretextual.  Plaintiffs point to a January 19, 2004 letter to the EEOC from Junida Y. Lee ("Lee"), a human relations generalist for defendant.  In that letter, Lee stated that defendant did not "accommodate" a request from Varghese to allow him to stay in his employment.  According to plaintiffs, this assertion is contradicted by Mersmann's testimony that Varghese complained to Union and Company officials that he was being mistreated.  Plaintiffs also highlight Lee's statement in the letter that the Company followed the step-by-step process set forth by the Union contract in implementing the relevant force adjustment.  However, plaintiffs maintain that this contract was broken when the company made a special amendment to open up ESIPP to save Varghese's job but failed to do the same for them.  Plaintiffs highlight the following testimony from Morgan's deposition:

> Q:  And can you tell me the reason why George was able to have a one-time memorandum of agreement that let him continue working when other people have not been availed this opportunity?
> A:  Well, I didn't negotiate this memorandum of agreement with the union for George.  I don't even believe I knew the name.  At the time I don't think anyone told me the name.  I did it really because the union was asking me to, very strongly employing (*sic*) me to.  And while I was concerned about it becoming a practice, so I insisted that it be a one-time nonprecedent-setting situation just for this surplus, I did acquiesce to the union's request and basically did them a favor.

(Morgan Depo., pp. 51-52).

> Q:  And special arrangements were hammered out in order to keep George Varghese hired by BellSouth, were they not?
> A:  Special arrangements were hammered out to benefit two people.  First of all, a person who wanted to leave voluntarily.  So that person benefitted

24

>
> because we were able to offer her SIPP pay, him or her.  I'm not even sure which.  And secondly, then George benefitted because he was able to take a vacancy that was created through SIPP.
>
> Q:   But no such opportunity was afforded either Jeff Mersmann or Val Williams?
>
> A:   That's correct.

(*Id.* at 56).

> Q:   So all the people tendered on the list, then, had to be people with less seniority than Jeff and Val in order for them to bump?
>
> A:   Jeff and Val do not have the bumping right as bumped employees.
>
> Q:   Would it be true that when George Varghese was scheduled to be bumped that there was nobody he could bump?
>
> A:   I think that's correct.
>
> Q:   And this is why the special arrangement was created for him?
>
> A:   Right, as I said before.

(*Id.* at 80).

## B.   Claim Two - Retaliation.

Plaintiffs also claim that they have been, and are currently being, retaliated against by BAPCO as a result of their filing claims with the EEOC for discrimination.  After leaving their positions with defendant, plaintiffs assert, they entered the BellSouth Job Bank in hopes of securing another BellSouth position.  According to plaintiffs, individuals in the BellSouth Job Bank are supposed to receive priority consideration for open positions.  Plaintiffs maintain that they have tested and placed at high levels.  They assert that Mersmann applied for numerous positions for which he was qualified while in the BellSouth Job Bank, including the positions of Investigation Assistant and Office Assistant.  Though qualified, plaintiffs assert, he was never contacted to interview for any position.  Plaintiffs conclude that BellSouth has and continues to

retaliate against them by failing to hire them for jobs for which they are qualified.[12]

## III.   **Defendant's Reply.**

Defendant reasserts its argument that plaintiffs' failure to establish a prima facie case and to prove pretext is fatal to their case.  Defendant contends that plaintiffs' miscellaneous complaints about the CBA cannot cure these failures of evidence.  Further, defendant asserts, plaintiffs' newly-raised claims are procedurally barred and without substantive merit.

### A.   **Plaintiffs' "Claim One" for Discriminatory Discharge is Unsupported.**

#### 1.   **Plaintiffs Have Not Shown that BAPCO Treated Similarly-Situated Comparators More Favorably.**

In order to establish a prima facie case in the context of a surplus or reduction-in-force, defendant asserts, a plaintiff must produce "evidence from which a reasonable factfinder could conclude that the employer intended to discriminate on the basis of [race or national origin] in making its employment decision."  *Mitchell v. USBI Co.,* 186 F.3d 1352, 1354 (11th Cir. 1999). Defendant notes that plaintiffs attempt to carry this burden by pointing to Varghese, an allegedly similarly-situated employee who supposedly received more favorable treatment.  Defendant contests plaintiff's theory that Varghese received special treatment because of his Middle Eastern appearance and defendant's desire to avoid a charge of backlash discrimination after the terrorist attacks of September 11, 2001.  Defendant asserts that this theory is pure speculation.  According to defendant, plaintiffs never heard any member of BAPCO management make any comment reflecting national origin or racial bias.  Further, defendant argues, Varghese is an American citizen from India, not a Middle Eastern terrorist.  *See Henderson v. Leroy Hill Coffee Co., Inc.,*

---

[12] Plaintiffs have failed to provide any evidence of their applications to the Job Bank or of defendant's failure to interview or hire them for open positions.

2001 WL 103147 at *6 (S.D. Ala. 2001) (finding that plaintiff could not avoid summary judgment by pointing to "her own subjective speculation as to the rationale" for adverse act); *Lewis-Webb v. Qualico Steel Co., Inc.,* 929 F.Supp. 385, 392 (M.D. Ala. 1996) (stating "speculation about the interviewer's motive are insufficient . . . 'Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions or rumors; discrimination law would be unmanageable if disgruntled employees could defeat summary judgment by speculating about the defendant's motives') (citing *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir.1994)).

Defendant also contests plaintiffs assertion that the Memorandum of Agreement applicable to the October 2001 surplus solely benefitted Varghese.  Defendant contends that this addendum also benefitted Evelyn Sanders, a white American in the same class as Plaintiff Mersmann.

Defendant further contends that plaintiffs cannot make the required showing that they and Varghese were similarly-situated in all relevant aspects.  *See Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1091 (11th Cir. 2004) (stating, "plaintiff and the employee she identifies as a comparator must be similarly situated 'in all relevant respects.'  The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer") (citation omitted).  Here, defendant argues, the differences are numerous: (1) Varghese was involved in the huge October 2001 surplus, whereas plaintiffs were involved in the much smaller 2003 surplus; (2) the poor labor relationship with the Union, which motivated the company to agree to the addendum requested by CWA for the 2001 surplus, had substantially improved by the time of the 2003 surplus; (3) because the new Access system was fully

implemented and stabilized by the time of the 2003 surplus, BAPCO could clearly determine it was over head count; and (4) the addendum was expressly designed as a limited, fixed-term agreement that applied only to the large October 2001 surplus.  According to defendant, plaintiffs have presented no evidence rebutting these facts.

### 2.   Plaintiffs Have Failed to Prove that Morgan Was Aware of Their Races and National Origin.

Defendant maintains that, as a matter of law, plaintiffs cannot establish a prima facie case or prove intentional discrimination absent evidence that the decision-maker, Morgan, knew their races and national origin.  Defendant points out that, in their depositions, plaintiffs admitted that they had never met, do not know, and would not recognize Morgan, who lives and works in Georgia.  (Mersmann Depo., p. 41; Williams Depo., p. 48-49).  Likewise, defendant argues, Morgan testified that he did not know the races or national origin of plaintiffs or Varghese, all of whom live and work in Alabama.  (Morgan Decl. ¶¶ 10, 13; Morgan Depo., pp. 45, 52, 93-94).

### 3.   Plaintiffs' Miscellaneous Complaints Regarding the CBA Are Not Probative.

According to defendant, BAPCO and the Union negotiate a new CBA every three years. In addition, defendant asserts, during the life of any particular CBA, either the Union or BAPCO may seek to negotiate an addendum or modification, often referred to as a memorandum of agreement.  (Morgan Depo., p. 72).  Defendant states that Article 7 of the CBA governs force adjustments, including surpluses, and spells out precisely how the surpluses shall be implemented.

Defendant claims that, in their Response, plaintiffs misinterpret how the CBA governs surpluses, bumping, and the like.  Defendant takes issue with plaintiffs' assertion that, under the

28

CBA, bumped employees are not allowed to bump others.  Defendant points to Morgan's

testimony and to page 61 of the CBA, which states "Employees listed on the LLL[13] who are

bumped and are more senior to a remaining PLL[14] or LLL employee may bump a junior

employee holding an equal or lower level job on the LLL."  (Morgan Depo., p. 39).

Defendant next addresses plaintiffs assertion that some portions of the surplus and

bumping procedures in the 2001 CBA are less favorable than the procedure in the earlier 1998

CBA.  Defendant argues that the CBA is well over 200 pages in length.  (Morgan Decl., Exh. A).

Defendant also points to Morgan's testimony that the bargaining process involves "gives and

takes" negotiated by BAPCO and the Union.  (Morgan Depo., p. 35).  Defendant maintains that

whether a few of the provisions in the 2001 CBA are, or are not, more favorable to employees

than corresponding provisions in the 1998 CBA is irrelevant.  *See Elrod v. Sears, Roebuck and

Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991) (stating that the federal courts "do not sit as a

super-personnel department that reexamines an entity's business decisions. No matter how

medieval a firm's practices, no matter how high-handed its decisional process, no matter how

mistaken the firm's managers, the [employment laws do] not interfere"); *Bristow v. Daily Press,

Inc.,* 770 F.2d 1251, 1255 (4th Cir. 1985) (stating, "[t]he employment discrimination laws . . .

cannot be transformed into a palliative for every workplace grievance, real or imagined . . ."); 

*Coaker v. Home Nursing Services, Inc.,* 1996 WL 316739 at *17 (S.D. Ala. 1996) (stating,

"harshness is immaterial to the question of discrimination . . . anti-discrimination laws are not a

shield against harsh treatment at the workplace") (citing *Nix v. WLCY Radio/Rahall*

---

[13] "LLL" is the "location layoff list" of employees.  (Morgan Depo., p. 41).

[14] "PLL" is the original list of surplus employees.  (Moran Dep., p. 41).

29

*Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984)).

Defendant asserts that plaintiffs' basic claim is that BAPCO discriminated against them by declining to expand the addendum applicable to the October 2001 surplus to all future surpluses, including the 2003 surplus that resulted in their discharge. Defendant reiterates its contention that the circumstances that induced BAPCO to negotiate the addendum for the October 2001 surplus were not present in subsequent surpluses, including the 2003 surplus. Accordingly, defendant argues, there is no evidence of discrimination, and plaintiffs complaints regarding the CBA's surplus procedures do not change this fact.

It is defendant's position that, to the extent plaintiffs are trying to allege a breach of the CBA, such a claim must be submitted to arbitration in accordance with the terms of the CBA. In *Republic Steel Corp. v. Maddox*, 379 U.S. 650 (1965), the Supreme Court explained that:

> [F]ederal labor policy requires that individual employees wishing to assert contract grievances must attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress . . . [U]nless the contract provides otherwise, there can be no doubt that the employee must afford the union the opportunity to act on his behalf. Congress has expressly approved contract grievance procedures as a preferred method for settling disputes . . .

379 U.S. at 652-53 (footnotes and citations omitted). The Supreme Court observed that "permit[ting] an individual employee to completely sidestep available grievance procedures in favor of a lawsuit has little to commend it" and "would deprive employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances." *Id.* at 653. *See also Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 411 (1988) (stating, "[i]nterpretation of collective-bargaining agreements remains firmly in the arbitral realm"); *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 220-21 (1985) (stating, "[it is] a central tenet of

30

federal labor-contract law under § 301 that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract . . . This complaint should have been dismissed for failure to make use of the grievance procedure established in the collective-bargaining agreement . . ."); *United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 567-69 (1960) (discussing arbitration of employee grievance).

Defendant argues that, even if plaintiffs had exhausted their contractual remedies under the CBA, they still would not have a viable claim arising from the alleged breach of the CBA. According to defendant, the only federal claim plaintiffs could have asserted for a breach of the CBA (i.e., a hybrid Section 301 claim under the Labor-Management Relations Act ("LMRA") against by Union and Company for breach of the duty of fair representation and breach of the CBA) would be time-barred by the LMRA's six-month statute of limitations.  29 U.S.C. § 160(b).

### 4.    Plaintiffs' New Age Discrimination Claim Is Barred.

In this case, defendant notes, plaintiffs filed EEOC charges alleging only race and national origin discrimination.  (Mersmann Depo., Exh. 4; Williams Depo., Exh. 2).  Defendant points out that plaintiffs' EEOC charges do not identify an age claim, do not allege age discrimination, and do not reference the Age Discrimination in Employment Act ("ADEA"). Similarly, defendant argues, plaintiffs did not raise an age claim, did not allege age discrimination, and do not reference the ADEA in their Complaints.

Plaintiffs first allege age discrimination in their Response.  Defendant notes that plaintiffs claim in their Response that BAPCO hired a lot of new employees three to five years ago as part of a plan to surplus more senior employees in 2003.  Defendant points out that plaintiffs did not

identify these employees by name, and did not provide dates of birth showing them to be younger

than plaintiffs.  Consequently, defendant contends, plaintiffs cannot prove a prima facie age

discrimination case.  *See Molenda v. Hoechst Celanese Corp.,* 60 F.Supp.2d 1294, 1304 (S.D.

Fla. 1999) (stating that to establish a prima facie case of age discrimination, a plaintiff must

prove "he was replaced by a person *substantially younger*"), *aff'd*, 212 F.3d 600 (11th Cir. 2000).


Moreover, defendant argues, plaintiffs filed the Response with these new allegations in

late December 2004.  According to defendant, discovery had closed in early November, almost

two months earlier.  Additionally, defendant asserts, the deadline for amending the pleadings and

adding claims had expired on September 19, 2004.

Defendant concludes that plaintiff cannot now raise an ADEA claim.  As a matter of law,

"a Title VII plaintiff cannot bring claims in a lawsuit that were not included in his or her EEOC

charge."  *Zellars v. Liberty Nat. Life Ins. Co.,* 907 F.Supp. 355, 358 (M.D. Ala. 1995) (citing

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974)).  Defendant argues that the scope of a

judicial complaint is limited to the scope of the "EEOC investigation which can reasonably be

expected to grow out of the charge of discrimination."  *Sanchez v. Standard Brands, Inc.,* 431

F.2d 455, 466 (5th Cir. 1970).

Defendant argues that courts have consistently ruled that an EEOC charge alleging one

type of discrimination cannot support a subsequent lawsuit alleging a different type of

discrimination.  Defendant draws the court's attention to *EEOC v. Mississippi College,* 626 F.2d

477 (5th Cir. 1980), in which the employee alleged sex discrimination in her original charge filed

with the EEOC.  626 F.2d at 479.  The plaintiff later attempted to amend the charge to include a

claim for race discrimination.  *Id.* at 480.  The Fifth Circuit held that because the "allegations of racial discrimination do not relate to or grow out of the allegations of sex discrimination advanced in the original charge, that aspect of the amended charge does not relate back to the time of filing of her original charge."  *Id.* at 483-84.  *See also Cabiness v. YKK (USA), Inc.,* 859 F.Supp. 582, 587 (M.D. Ga. 1994) (dismissing claims of hostile environment harassment, retaliation, and discriminatory terms and conditions of employment because EEOC charge was only for wrongful termination); *Eastwood v. Victor Temporaries,* 441 F.Supp. 51, 53 (N. D. Ga. 1977) (dismissing allegations of harassment, intimidation, and retaliation because they were not first raised with the EEOC).  Defendant points out that courts outside the Eleventh Circuit have also concluded that a plaintiff cannot maintain a claim for one type of discrimination if her EEOC charge asserted a different type of discrimination.  *See Leigh v. Bureau of State Lottery,* 876 F.2d 104 (6th Cir. 1989) (stating, "[t]he EEOC charge of discrimination filed by appellant alleges only race discrimination, and it cannot be construed as involving sex-based discrimination even under the most solicitous interpretation of the language. . . . the addition of sex-based discrimination to the complaint is an impermissible expansion of the EEOC charge . . .") (unpublished); *Herzog v. McLane Northeast, Inc.,* 999 F.Supp. 274 (N.D. N.Y. 1998) (dismissing sex discrimination charge when EEOC charge alleged only disability discrimination in violation of the ADA); *McNight v. Dormitory Authority of State of N.Y.,* 995 F.Supp. 70, 82 (N.D. N.Y. 1998) (dismissing plaintiff's ADA claim because her administrative charge alleged only race discrimination/retaliation: "Courts have uniformly rejected the argument that exhaustion is satisfied when a plaintiff's administrative charge alleges discrimination based on another type of discriminatory conduct").

Defendants further point out that plaintiffs did not file an ADEA claim in court within 90

days of receiving notice of right to sue, a statutory condition precedent to maintaining a cause of

action under the ADEA. *Gitlitz v. Compagnie Nationale Air France,* 129 F.3d 554, 556-58 (11th

Cir. 1997). In this case, defendant asserts, the EEOC issued notices of right to sue in April 2004.

(Mersmann Depo., Exh. 6; Williams Depo., Exh. 4). Plainly, defendant argues, more than 90

days elapsed before plaintiffs even mentioned a potential age claim in this action.

**B.     Plaintiffs' "Claim Two" for Retaliation Is Also Unsupported.**

Defendant notes that in their Response, plaintiffs alleged, for the first time, that BAPCO

had retaliated against them for filing EEOC charges. Specifically, plaintiffs claim that BAPCO

"refused to rehire them on many jobs for which they are qualified." Defendant argues that

plaintiffs have not identified the employee(s) who supposedly received such jobs. Defendant

further maintains that plaintiffs have not provided any evidence proving themselves to be better

qualified than such employee(s).

Additionally, defendant contends, plaintiffs never alleged retaliation or retaliatory refusal

to hire in their Complaints. They have never amended or requested leave to amend their

Complaints to add such claims. Defendant points towards its previous arguments regarding

plaintiffs' age discrimination claims and asserts that plaintiffs cannot now raise these new,

entirely different claims at the summary judgment stage.

## CONCLUSIONS OF THE COURT

The plaintiffs are understandably disappointed at being laid off from their employment.

Being disappointed, however, does not necessarily result from discrimination. Normal business

decisions cannot be converted into discriminatory acts.

34

Even assuming that the plaintiffs have proved a prima facie case,[15] it is apparent that the plaintiffs have not rebutted the defendant's articulated non-discriminatory reasons for its actions.

In order to conclude that the plaintiffs have established a reasonable inference of discrimination, the court would have to find that the plaintiffs have presented evidence that:

(1) The decision maker(s) knew of the race, national origin, etc. of the pertinent parties and considered those factors in making what otherwise appear to be normal business decisions.

(2) That the pertinent parties were similarly situated although there was a lapse of months between the surpluses.

(3) That, somehow, the parties who negotiated the 2002 addendum gave some special discriminatory consideration to its future effect on the plaintiffs, or that, in 2003, the defendant was intentionally discriminatory in not adopting another addendum (assuming that the Union would have agreed to it).

There is absolutely no reasonable inference that the plaintiffs were intentionally discriminated against because of age, sex, race, national origin or on any other protected basis. They were merely among a number of surplus employees.

The court will not repeat the other arguments of the defendant, some of which may be well-founded.  The obvious lack of evidence of intentional discrimination will result in a grant of the defendant's Motion.

---

[15] The court will not repeat the defendant's arguments to the contrary.

This 19th of January, 2005.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**